832 F.2d 1180
 56 USLW 2270, 14 Media L. Rep. 1827
 SOCIETY OF PROFESSIONAL JOURNALISTS, et al., a Utah
non-profit corporation, Plaintiffs-Appellees,
v.
The SECRETARY OF LABOR, Defendant-Appellant.
EMERY MINING CORPORATION, a Utah corporation, Plaintiff-Appellee,
v.
The UNITED STATES SECRETARY OF LABOR, Defendant-Appellant.
 No. 86-1753.
 United States Court of Appeals,
Tenth Circuit.
 Oct. 30, 1987.
 
 Douglas Letter, Appellate Litigation Counsel, Appellate Staff, Civil Div., Dept. of Justice (Richard K. Willard, Asst. Atty. Gen., and Brent D. Ward, U.S. Atty., with him on the brief), Washington, D.C., for the Secretary of Labor, defendant-appellant.
 Patrick A. Shea (Alan L. Sullivan, Samuel O. Gaufin, and David L. Deisley of Van Cott, Bagley, Cornwall & McCarthy, with him on the brief), Salt Lake City, Utah, for Society of Professional Journalists, plaintiff-appellee.
 Timothy M. Biddle, Thomas C. Means, and Peter K. Levine of Crowell & Moring, Washington, D.C., of counsel: James T. Jensen, Jensen Law Offices, Price, Utah, on the brief as attys. for Emery Min. Corp.
 Before SEYMOUR, MOORE, and McWILLIAMS, Circuit Judges.
 McWILLIAMS, Circuit Judge.
 
 
 1
 On December 19, 1984, a fire started inside the Wilberg Mine near Price, Utah. Twenty-seven miners were trapped in the mine and ultimately perished. Immediately after the fire began, representatives of the Mine Safety & Health Administration (MSHA), a part of the Department of Labor, arrived at the mine site and monitored the unsuccessful rescue efforts.
 
 
 2
 Pursuant to statute, MSHA also began an investigation into the cause of the fire. 30 U.S.C. Sec. 813(a)(1).[1] As a first step in its investigation, MSHA interviewed some 300 persons, including employees at the mine, rescue workers, MSHA personnel, and the like, to determine which persons had information that might prove "helpful" to the investigation. The next step in the MSHA investigation was to "invite" those persons thought to have "helpful" information to take part in more formal "questioning sessions" with the MSHA. Participation in these questioning sessions was voluntary and the person involved was not to be placed under subpoena. However, the person was to be interrogated under oath, and his, or her, statements were to be recorded by a court reporter. Further, the person to be interviewed was allowed to have an attorney, or advisor, present.
 
 
 3
 These MSHA questioning sessions were scheduled to begin on January 21, 1985, and it was the intent of MSHA to allow a representative of Emery Mining Corporation, the operator of the Wilberg Mine, the Chief Mine Inspector for the State of Utah, and a representative of the United Mine Workers to participate in these sessions. Further, representatives of the Utah Power & Light Company, the owner of the Wilberg Mine, the Utah Public Service Commission, and the Bureau of Land Management were to be allowed to attend these sessions. However, the MSHA did not intend to admit to these sessions members of the general public, or members of what has historically been referred to as the Fourth Estate.[2] And therein lies the root of the present problem.
 
 
 4
 On January 23, 1985, two days after MSHA started its sessions, the Society of Professional Journalists, a Utah non-profit corporation, and several Utah television stations and newspapers brought the present action against the Secretary of Labor in the United States District Court for the District of Utah. The action was based on the First Amendment to the Constitution of the United States and the Federal Mine Safety and Health Act and sought declaratory relief, and in connection therewith asked for a temporary restraining order, a preliminary injunction, and a permanent injunction. In their complaint, the Society alleged that MSHA was about to conduct hearings in Price, Utah, for the purpose of investigating and determining the cause of the fire in the Wilberg Mine on December 19, 1984, and that MSHA was not allowing the Society, or even a "designated 'pool' reporter," access to those hearings. The Society sought a judgment declaring that MSHA's hearings be public hearings, and that the Society, or its designee, be given access to such hearings. In connection therewith, the Society sought a temporary restraining order, a preliminary injunction, and a permanent injunction granting the Society access to such hearings.[3]
 
 
 5
 On January 24, 1985, after a hearing at which both parties were represented, the district court entered a temporary restraining order, which, in effect, permitted MSHA to exclude the press when the following persons only were permitted to be present at the questioning session: (1) MSHA personnel; (2) a court reporter; (3) the person to be questioned; and (4) his, or her, attorney or advisor. However, the temporary restraining order further provided that if MSHA allowed any other person to be present at any investigative hearing, then "the public and press" should also be allowed to be present. The temporary restraining order, by its own terms, directed the Secretary to appear in court on February 1, 1985, and show cause, if any there be, why the temporary restraining order should not be made permanent during the pendency of this action. The Secretary elected to conduct no investigative sessions until the district court entered a further injunctive order.
 
 
 6
 On February 1, 1985, a hearing was held concerning a preliminary injunction. At the conclusion thereof, the district court extended the temporary restraining order until such time as a preliminary injunction was entered.
 
 
 7
 On February 8, 1985, the district court entered a preliminary injunction which was similar in general form to the temporary restraining order, but permitted additional persons to be present at the investigative sessions before MSHA was required to admit the media. Specifically, the preliminary injunction provided that MSHA need not admit the media at any such hearing if only the following were present: (1) MSHA personnel; (2) representatives of the Utah Industrial Commission; (3) the United Mine Workers; (4) a court reporter; (5) the person to be questioned; and (6) his attorney, or advisor, but further provided that if any additional or other parties were allowed to be present at the hearing, then a reporter from the print media and a "pool camera and microphone" should be allowed access to the hearing.
 
 
 8
 At this point Emery Mining Corporation, the operator of the Wilberg Mine, filed a separate action against the Secretary wherein it sought an order that it be allowed to attend these investigative sessions. The district court consolidated Emery's action with the present one and later modified its preliminary injunction so as to allow Emery's attendance at investigative sessions without requiring media access to the hearings.[4]
 
 
 9
 Neither the Society nor the Secretary appealed the district court's preliminary injunction. Accordingly, the investigative sessions were conducted in March and early April, 1985, and concluded sometime in April, 1985, after interviewing, on the record, about 100 persons. As the hearings were being held, transcripts of the testimony were made public and MSHA filed a preliminary report.[5]
 
 
 10
 Either after the investigative hearings had been concluded, or, more probably, as such hearings were in their final stages, the Secretary filed a motion for summary judgment.[6] This motion was argued on May 9, 1985, and the district court filed its Memorandum Decision and Order on August 21, 1985. See Society of Professional Journalists, et al. v. Secretary, 616 F.Supp. 569 (D.Utah 1985).
 
 
 11
 The district court in its Memorandum Decision and Order characterized the Secretary's motion for summary judgment as being centered on one issue: "whether the Constitution or federal law requires that the formal fact-finding hearings conducted by MSHA be open to the press and public." 616 F.Supp., at 571. The district court held that the federal statute relied on by the Society, 30 U.S.C. Sec. 813(b), is permissive and, accordingly, did not require the Secretary to open to the press or public a hearing brought under the authority of 30 U.S.C. Sec. 813(a)(1). However, the district court went on to hold that the First Amendment does require that such sessions be open to the press and public. There is no discussion in the district court's Memorandum Decision and Order concerning persons or parties who might be present at investigative sessions and whose presence would not trigger admission to the hearings by the press, as was true in both the temporary restraining order and preliminary injunction.[7] Hence, it would appear that the Society would have a right of access to any proceeding by MSHA under 30 U.S.C. Sec. 813(a)(1).
 
 
 12
 On March 14, 1986, the district court, in line with its Memorandum Decision and Order, entered formal judgment from which the present appeal is taken. That judgment, in pertinent part, provides as follows:
 
 
 13
 IT IS HEREBY ORDERED, ADJUDGED, AND DECREED:
 
 
 14
 1. That the public and the press have a constitutional right of reasonable access to the formal administrative hearings of the type being conducted by the Secretary of Labor in relation to the Wilberg Mine accident in Price, Utah. Such right of access of the press includes, at a minimum, the right to access to such hearings by means of a pool reporter from the print media and a pool camera. Unless such should be impractical for reasons outside the control of the Secretary of Labor, such right of access further includes the right to use of a room or area adjacent to the hearing room for viewing of the proceedings by the press and the public by means of a feed from the pool camera. However, any member of the public or the press attending such proceedings remains subject to reasonable rules of conduct prescribed by the Secretary of Labor or his representatives to facilitate orderly proceedings.
 
 
 15
 2. That the Secretary of Labor and all persons acting at his request or under his auspices be and is hereby permanently enjoined from conducting formal administrative hearings into the Wilberg Mine accident unless members of the public or the press are afforded at least such access as they are declared entitled to hereunder.
 
 
 16
 3. The Court will retain jurisdiction for the purpose of enforcing this Judgment with respect to any further proceedings by the Secretary of Labor with respect to the Wilberg Mine accident and with respect to any ancillary matters. However, the Court finds that there is no just reason for delaying the finality of this Judgment as to those issues determined hereby and, therefore, directs that this Judgment be deemed final as to those issues upon entry.
 
 
 17
 Although the judgment of the district court speaks in terms of "further proceedings by the Secretary of Labor with respect to the Wilberg Mine accident and with respect to ancillary matters," in its Memorandum Decision and Order entered August 21, 1985, the district court recognized that the sessions, or hearings, which were the target of Society's complaint, were, in fact, completed in April, 1985.[8] In this regard, there is certainly nothing in the record before us to indicate that further questioning sessions are contemplated by MSHA in connection with the Wilberg Mine accident. Further, the district court observed in its Memorandum Opinion and Order that the fact that the sessions had been concluded would suggest that perhaps the controversy between the Society and the Secretary had become moot. However, the district court noted that the Secretary had not raised the issue of mootness, "presumably because the situation is 'capable of repetition, yet evading review,' and thus excepted from the mootness doctrine," citing Southern Pacific Terminal Co. v. I.C.C., 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310 (1911).
 
 
 18
 In this court, no party raises the mootness issue, although the Secretary makes limited reference thereto in his opening brief. In this regard, the Secretary at page 14 of his opening brief states that although the "questioning sessions involving the Wilberg Mine ended in April, 1985, the district court retained jurisdiction to issue a final judgment, and this Court has appellate jurisdiction" because the conduct of MSHA in the now completed investigation of the Wilberg Mine fire is "capable of repetition, yet evading review." In this latter connection, the Secretary states that in order for a fact situation to fit into the "capable of repetition, yet evading review" mold there must be "a reasonable expectation that the parties will again be embroiled in the controversy and that its limited duration prevents full judicial review," citing Combined Communications Corporation v. Finesilver, 672 F.2d 818 (10th Cir.1982).
 
 
 19
 Is there a reasonable expectation that the Society and the Secretary will at some uncertain future date again be embroiled in a controversy over the former's right to be present at investigative sessions to be held by MSHA in connection with a major mine accident at the Wilberg Mine, or somewhere else in Utah, and that such controversy would, by its nature, evade judicial review? We think not. Such presupposes a major accident in Utah, if not at the Wilberg Mine itself, with MSHA thereafter electing to proceed under 30 U.S.C. Sec. 813(a)(1), even though MSHA could, if it chose, proceed under 30 U.S.C. Sec. 813(b).[9] Such, to us, is not a reasonable expectation. In our view, in the instant case there is no more "demonstrated probability" that the present fact situation will recur than there was a "demonstrated probability" in Weinstein v. Bradford, 423 U.S. 147, 96 S.Ct. 347, 46 L.Ed.2d 350, (1975), that Bradford would again be subjected to the parole system.
 
 
 20
 Further, in our view, any proposed course of conduct by MSHA would be subject to judicial review, as it was in the instant case. The Society filed its complaint two days after MSHA commenced its questioning sessions. After hearing, a temporary restraining order issued three days later. MSHA delayed its sessions until after the district court had opportunity to consider, and enter, a preliminary injunction. On February 8, 1985, the district court issued a preliminary injunction, which governed the sessions thereafter held by MSHA. A preliminary injunction is an appealable order, but neither side chose to appeal. This court entertains many appeals from preliminary injunctions, and can act, and has acted, expeditiously where there is a true emergency.
 
 
 21
 The fact situations in such cases as Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982); Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980); and Nebraska Press Association v. Stuart, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976), are not akin to those in the instant case. Globe Newspaper involved a Massachusetts statute which required exclusion of the press during the testimony of a minor victim in a sex offense trial. See 457 U.S., at 598, 102 S.Ct., at 2615. Nebraska Press involved, inter alia, a decision of the Nebraska Supreme Court authorizing state prosecutors to seek restrictive orders, a "gag" order in that case, in appropriate cases. See 427 U.S., at 546-47, 96 S.Ct., at 2796-97. In Richmond Newspapers, the Supreme Court noted that the Virginia Supreme Court had declined plenary review and that accordingly, it was reasonably foreseeable that other trials might be closed by other judges without any more of a showing of need than was presented in that case. 448 U.S., at 563, 100 S.Ct., at 2820. In those circumstances, the Supreme Court held that the test of "capable of repetition, yet evading review" was met.[10] Our case involves the possibility of a future major mine accident in Utah where MSHA would institute an investigation under 30 U.S.C. Sec. 813(a)(1) and not 30 U.S.C. Sec. 813(b), and bar the press from hearings held in connection therewith. Such, to us, is speculative and quite "iffy," not a "reasonable expectation."
 
 
 22
 In our view, such cases as New Jersey Turnpike Authority v. Jersey Central Power and Light, 772 F.2d 25 (3d Cir.1985) and C & C Products, Inc. v. Messick, 700 F.2d 635 (11th Cir.1983) are more analogous to the instant case. In each of those cases the Circuit Court held that the controversy was not "capable of repetition, yet evading review." In New Jersey Turnpike, the Third Circuit stated that " 'capable of repetition' is not a synonym for 'mere speculation'." In C & C Products, the Eleventh Circuit stated that a "case must be viable at all stages of the litigation; it is not sufficient that the controversy was live only at its inception" and that where a controversy has become moot by subsequent events which preclude a grant of effective relief, the appeal should be dismissed as moot. 700 F.2d, at 636.
 
 
 23
 In sum, if the district court's Judgment and Order was only intended to regulate and control further hearings by MSHA into the December 19 fire at the Wilberg Mine, it was inappropriate, since MSHA's investigative hearings into that accident were over and done nearly a year before the date of judgment. However, if the Judgment and Order was intended to regulate and control investigative hearings by MSHA in connection with future mine accidents at the Wilberg Mine, or possibly elsewhere, such would not fit into the "capable of repetition, yet evading review" mold. Accordingly, the controversy between the Society and the Secretary, which was a live controversy when the preliminary injunction entered, had become moot by the time the district court entered its Memorandum Decision and Order on August 21, 1985, and its formal judgment on March 14, 1986.
 
 
 24
 The appeal is dismissed and the cause is remanded with directions that the district court vacate its judgment and withdraw its Memorandum Decision and Order.
 
 
 25
 SEYMOUR, Circuit Judge, concurring.
 
 
 26
 Under the distinct two-part test announced in Weinstein v. Bradford, 423 U.S. 147, 149, 96 S.Ct. 347, 348, 46 L.Ed.2d 350 (1975), and applied by this circuit in Combined Communications Corp. v. Finesilver, 672 F.2d 818, 820-21 (10th Cir.1982), a case is not moot where:
 
 
 27
 "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again."
 
 
 28
 423 U.S. at 149, 96 S.Ct. at 349 (emphasis added). I agree with the majority's refusal to reach the merits because this case is not the type that is too short-lived to be fully litigated before expiration of the controversy. As the majority opinion states, had the preliminary injunction been appealed, we could have fully reviewed it before the MSHA proceedings resumed. The issue presented was thus capable of full review in a true case or controversy, and we therefore should not address it here.
 
 
 29
 The majority also decides, however, that a decision on the merits is not justified because the case is not sufficiently likely to recur. I am writing separately because I believe that deciding this issue in this case is wrong, for three reasons. First, the "incapable of review" prong completely decides this case. We should not abandon our usual, prudent practice of not reaching out to decide unnecessary issues. Second, under this court's precedent, I seriously doubt whether this case is so incapable of repetition that it fails that prong of the test. See Combined Communications, 672 F.2d at 820-21. And third, the Supreme Court has been very willing to reach the merits of significant undecided press access issues even where the harm alleged had become incapable of redress. See, e.g., Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982). In light of the Court's unwillingness to articulate a clear standard in a press case like the one before us, deciding the issue without the benefit of briefs or argument is imprudent.
 
 
 30
 Only the latter two points require elaboration. As we recognized in Combined Communications, a defendant bears a heavy burden in arguing that its allegedly unconstitutional practices will not repeat themselves. 672 F.2d at 821 (citing United States v. W.T. Grant & Co., 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953)). We held there that a local rule denying television camera access to statutorily mandated open meetings did not violate the First Amendment. Despite the unique nature of the redistricting proceedings in that case, we held that the possibility of a similar harm occurring to the plaintiff was "not so remote and speculative that the controversy must be considered moot." Id. I fail to see how the majority can so confidently conclude that the situation in the instant case is less likely to recur.
 
 
 31
 More important than the conflict between this case and our holding in Combined Communications, however, is the majority's unwillingness to recognize the importance of First Amendment claims to justiciability. The Supreme Court has reached the merits in three press access cases that raised novel First Amendment implications without elaborating on the precise meaning of "reasonably likely to recur." See Globe Newspaper Co., 457 U.S. 596, 73 S.Ct. 2613; Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980); Nebraska Press Association v. Stuart, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976). Absent Supreme Court guidance as to where the line should be drawn, unnecessarily deciding an issue with a potentially significant effect on future First Amendment litigation is unwise, particularly without the benefit of argument.
 
 
 32
 The majority attempts to justify its holding by concluding that "in the instant case there is no more 'demonstrated probability' that the present fact situation will recur than there was a 'demonstrated possibility' in Weinstein v. Bradford, 423 U.S. 147 [96 S.Ct. 347, 46 L.Ed.2d 350], that Bradford would again be subjected to the parole system." Maj. op. at 1185. Although this may be correct, Weinstein involved a Fourteenth Amendment inquiry into the procedural rights due during parole eligibility determinations rather than a First Amendment question.
 
 
 33
 The majority's apparent belief that the mootness inquiry can be conducted within a neutral legal framework applicable in like fashion to all cases regardless of the underlying issues is insupportable. The malleability of all justiciability questions is well established. See, e.g., Flast v. Cohen, 392 U.S. 83, 94-95, 97, 88 S.Ct. 1942, 1949, 1951, 20 L.Ed.2d 947 (1968) (recognizing that a justiciability decision must involve policy considerations because "its utilization is the resultant of many subtle pressures"). As to mootness, the Supreme Court has recognized for more than a quarter century that "a public interest in having the legality of practices settled, militates against a mootness conclusion." United States v. W.T. Grant Co., 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953). The public interest in a well defined First Amendment deserves consideration in deciding the justiciability of a lawsuit. See Meese v. Keane, --- U.S. ----, 107 S.Ct. 1862, 1866-67, 95 L.Ed.2d 415 (1987) (relying on the special nature of a First Amendment injury to find standing); Wilson v. Stocker, 819 F.2d 943, 946 (10th Cir.1987) (noting the importance of the plaintiff's allegation that his First Amendment rights were chilled by the statute in question); cf. Houston v. Hill, --- U.S. ----, 107 S.Ct. 2502, 2512-13, 96 L.Ed.2d 398 (1987) ("we have been particularly reluctant to abstain in cases involving facial challenges based on the First Amendment").
 
 
 34
 We need not and should not address the "reasonably likely to recur" prong of the Weinstein test in holding that this case is moot. Before ruling on an issue that could result in the inability of the press to have First Amendment claims addressed, I strongly believe that we should wait for a case where the issue is necessary to our decision and fully argued by the parties.
 
 
 
 [1]
 In the instant case, MSHA takes the position that it was not acting pursuant to 30 U.S.C. Sec. 813(b), which statute provides for "public hearings" with the power of subpoena. Rather, as indicated, MSHA asserts that its investigation of the fire was pursuant to 30 U.S.C. Sec. 813(a)(1)
 
 
 [2]
 A name often given to the newspaper profession. The coinage of this name has been attributed to Thomas Babington Macaulay (1800-1859), an English statesman, historian, essayist and poet, who, in 1828, wrote in an essay that "[t]he gallery in which the reporters sit has become a fourth estate of the realm," thus adding a term to those already used to designate the existing three estates, or classes of the English realm, i.e., royalty, lords and commoners
 
 
 [3]
 Society's complaint stated that the proposed hearings were pursuant to 30 U.S.C. Sec. 813(b). As previously stated, MSHA, however, insists that it was not proceeding under 813(b), but under 813(a)(1). The district court recognized this distinction and made its ruling on the premise that this was a hearing under 813(a)(1). If it were truly an 813(b) hearing, it would necessarily, by virtue of the statute itself, be a public hearing
 
 
 [4]
 Emery, although technically a plaintiff, is allied in interest with the Secretary. Emery was not a party to the Secretary's summary judgment motion, and filed no notice of appeal from the district court's decision. However, by leave of court, Emery did file briefs in this appeal
 
 
 [5]
 We understand that MSHA has recently filed its final report in the matter
 
 
 [6]
 The Secretary's motion for summary judgment is not a part of the record before us. We glean its substance from the district court's memorandum decision and order
 
 
 [7]
 At or about the time the Secretary filed his motion for summary judgment, he also filed a motion for protective order. Apparently, the Society had previously requested the production by the Secretary of certain documents, and proposed to take the depositions of three government employees, all designed to ascertain the government's policies and practices regarding the investigation of mine accidents. The Secretary's request for a protective order was denied in the same Memorandum Decision and Order which denied his motion for summary judgment
 
 
 [8]
 Although MSHA's investigative sessions were concluded in April, 1985, we are advised that there is now a proposed assessment of a civil penalty in the amount of $111,470 against the owner and operator of the Wilberg Mine as the result of the investigation into the December 19th fire. We are not advised whether the proposed assessment has been contested
 
 
 [9]
 The district court's Memorandum Decision and Order and its formal judgment are, in our view, both tied into the December 19th fire at the Wilberg Mine, and suggest the possibility of a resumption of proceedings by the Secretary "with respect to the Wilberg Mine accident." However, from the record before us, it appears that MSHA's investigative sessions, the subject of this action, were concluded once and for all in April, 1985. In this court, the Secretary argues that the controversy between the Society and the Secretary is likely to reoccur should MSHA, in the future, attempt to conduct a closed mine accident investigation
 
 
 [10]
 In like fashion, in Combined Communications Corp. v. Finesilver, 672 F.2d 818 (10th Cir.1982), this court was concerned with a district court rule that prohibited cameras in the courthouse, and, because of that local rule, we found that the controversy in that case was "capable of repetition" even though the particular hearing from which the television cameras had been barred was over